[Cite as *State v. Crawl*, 2024-Ohio-752.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

STATE OF OHIO                           :
                                        :
    Appellee                        :       C.A. No. 29859
                                        :
v.                                      :       Trial Court Case No. CRB2200844
                                        :
DORIAN L. CRAWL                         :       (Criminal Appeal from Municipal Court)
                                        :
    Appellant                       :
                                        :

. . . . . . . . . . .

O P I N I O N

Rendered on March 1, 2024

. . . . . . . . . . .

ARVIN S. MILLER, Attorney for Appellant

MARIA L. RABOLD, Attorney for Appellee

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-Appellant, Dorian L. Crawl, appeals from a judgment finding him guilty of menacing by stalking in violation of R.C. 2903.211(A)(1). According to Crawl, his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence because the State failed to prove the following matters: that Crawl acted knowingly; that the alleged victim, A.P., suffered mental distress; and that Crawl

engaged in a pattern of conduct as required by the statute. Having reviewed the record, we find the conviction was supported by sufficient evidence and was not against the manifest weight of the evidence. Accordingly, Crawl's assignments of error will be overruled, and the judgment of the trial court will be affirmed.

## I. Facts and Course of Proceedings

{¶ 2} On August 11, 2022, the State filed a criminal complaint against Crawl charging him with menacing by stalking in violation of R.C. 2903.211(A)(1), a first-degree misdemeanor. The alleged victim, A.P., was Crawl's former classmate.

{¶ 3} After Crawl pled not guilty, the court held a bench trial on June 13, 2023. At that time, the State presented testimony from A.P. and from Sergeant Selmon, who was employed by the West Carrollton Police Department. A.P. testified that she knew Crawl but did not recall having seen him since she was around 12 or 13 years old, when they had attended the same elementary school. Trial Transcript ("Tr."), 11. A.P. had not talked to Crawl since that time. *Id.* at 11-12. They were not friends during school, and A.P. was not sure she had ever even talked to Crawl. *Id.* at 25. At the time of trial, A.P. was 30 years old and had a nine-year old child. *Id.* at 6.

{¶ 4} In 2020, Crawl sent a message to A.P. through her social media account on Instagram. A.P. did not respond and did not approve a friend request. *Id.* at 12-13. A.P. had had the Instagram account since around high school, but she had not used it as frequently in the past as she did in 2022. As a result, A.P. did not see Crawl's 2020 message until May 24, 2022, when she posted again on Instagram and became aware of

the prior message.   *Id.* at 14 and 20.

{¶ 5} On that day, A.P. posted a picture for her birthday, which said, "29, be great to me."   *Id.*   A.P.'s Instagram account was not private, so anyone could see her posts. *Id.* at 18.   In response, Crawl sent another message, with a "sad emoji."   Underneath, Crawl stated: "Happy Birthday, baby girl.   I love you.   Hope we can see each other sometime soon."   *Id.* at 16.   A.P. did not respond to these messages.   They made her feel very uncomfortable.   *Id.*

{¶ 6} On May 30, 2022, A.P. posted what is called a "Boomerang" video, in which someone throws a boomerang and it comes back to them.   Tr. at 17-18 and 20.   In response to the video, Crawl sent a message stating, "Where is this, [A.P.]?   Is this your house, boo?"   A.P. did not respond to that message, either.   *Id.* at 18.   Subsequently, on June 27, 2022, Crawl showed up at A.P.'s front door, and A.P. looked through the peephole and saw him.   When she asked who was there, Crawl said, "It's Dorian.   I'm [A.P.'s] friend.   I'm here to see her."   At that point, Crawl turned the doorknob.   *Id.* at 9-10.

{¶ 7} A.P. "freaked out" because Crawl had been sending messages asking where she lived and a lot of weird things.   Her child was also in the house, and she did not know if Crawl was going to try to continue to force his way through the door.   *Id.* at 19, 21, and 26.   The door was unlocked, and A.P. turned the deadbolt.   She then ran back to where her daughter was, placed her in a closet, and told her not to move until she (A.P.) came back.   A.P. then called the police.   *Id.* at 10.

{¶ 8} After the incident, A.P. installed cameras around her apartment, made sure

that she was on her phone with someone when she came home late at night with her daughter, and had her boyfriend stay over a lot more often because she was uncomfortable staying alone. *Id.* at 19. A.P. was also looking for another place to live and intended to move immediately. *Id.* at 19-20. She said she continued to have a great deal of anxiety in general and upon seeing Crawl in court. *Id.* at 28.

{¶ 9} On June 27, 2022, Officer Selmon was dispatched to the area regarding "suspicious circumstances where a male had tried to enter a residence." Tr. at 32. When Selmon first made contact with A.P., she "was visibly upset, shaken, crying." *Id.* Selmon stated, "You could tell she was nervous, as if something significant happened to her." *Id.* at 32-33. Selmon then investigated, including speaking with Crawl over the telephone. *Id.* at 33.

{¶ 10} Crawl told Officer Selmon that "he had known [A.P.] since their teenage years, that they were never friends, never talked in school, but that he felt there was more and he was looking into that, more of a relationship that they could have had. So he was attempting to make contact with A.P. to follow up on that." *Id.* at 34. Crawl also said that "he was trying to figure out what was going on with them and elaborated, stating that basically that meant that – why she had never asked him to prom in their younger years and then why there wasn't a relationship." *Id.* at 34-35.

{¶ 11} Concerning A.P.'s lack of response, Crawl told Selmon that A.P. had never provided him with her address and that he had located it by Googling her name. Crawl stated that was how he came across A.P.'s address and showed up at her house on June 27, 2022. *Id.* at 35. In addition, Crawl told Selmon that he "was trying to remain calm

and collected" and that he had not liked the way [A.P.] had reacted to him.   *Id.* at 36-37. Even after the criminal action was filed, Crawl sent messages to A.P. through her Facebook account in March 2023.   *Id.* at 26-27.

{¶ 12} At the end of the State's case, Crawl moved for a judgment of acquittal, which was denied.   Tr. at 41-44.   The defense then elected not to present any evidence. After taking the matter under advisement, the court found Crawl guilty on June 22, 2023. The court sentenced Crawl to 180 days in jail, suspended 178 days with two days jail time credit, placed him on probation for two years, and issued a protection order prohibiting him from having contact with A.P. for a period of two years.   Crawl filed a motion to stay execution of his sentence during the pendency of the appeal, and the trial court granted a stay on July 12, 2023.   Previously, Crawl had filed a timely notice of appeal from his conviction.

II.   Sufficiency of the Evidence and Manifest Weight Challenge

{¶ 13} In support of his appeal, Crawl has raised two assignments of error. Because they are interrelated, we will consider them together.   Crawl's first assignment of error states that:

The Trial Court Erred by Not Granting the Defendant's Rule 29 Motion for Acquittal When the State Failed to Provide Sufficient Evidence on All Elements of the Charge, Thus Violating the Defendant's Due Process Rights.

{¶ 14} Crawl's second assignment of error states that:

The Trial Court Committed Error by Not Granting the Defendant's Motion for Acquittal at the Close of the State's Case.

{¶ 15} Concerning sufficiency, Crawl contends the State failed to provide evidence about several elements of stalking. Specifically, Crawl asserts: (1) a lack of evidence that he knowingly caused A.P. to believe he would harm her or that he knowingly caused A.P. emotional distress; and (2) a lack of evidence of a pattern of conduct that would support a stalking conviction. The manifest weight challenge is based on the same points.

## A. Applicable Standards

{¶ 16} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). In such situations, we apply the test from *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), which states that:

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the

essential elements of the crime proven beyond a reasonable doubt. *Id.* at paragraph two of the syllabus.

{¶ 17} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. In this instance, a court reviews " 'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). *Accord State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 193.

{¶ 18} "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. *Accord State v. Pulley*, 2d Dist. Montgomery No. 29501, 2023-Ohio-3277, ¶ 140. Consequently, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

{¶ 19} As an additional matter, "[b]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). *Accord State v. Brock*, 2019-Ohio-3116, 140 N.E.3d 1239, ¶ 19 (2d Dist.).

## B.   Discussion

{¶ 20} Crawl was charged with menacing by stalking in violation of R.C. 2903.211(A)(1).   This statute provides that: "No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person."

{¶ 21} In challenging his conviction, Crawl first argues that his actions did not threaten A.P. and did not cause her mental distress.   He notes that his remarks on A.P.'s social media account constituted nothing more than uncomfortable comments, and that A.P. never blocked him from viewing her public posts or told him to stop responding to her posts.

{¶ 22} " ''Mental distress' means any of the following: (a) Any mental illness or

condition that involves some temporary substantial incapacity; (b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services." R.C. 2903.211(D)(2)(a) and (b). " 'Mental distress need not be incapacitating or debilitating * * * [and] expert testimony is not required to find mental distress.' " *State v. Szloh*, 189 Ohio App.3d 13, 2010-Ohio-3777, 937 N.E.2d 168, ¶ 18 (2d Dist.), quoting *Perry v. Joseph*, 10th Dist. Franklin Nos. 07AP-359, 07AP-360, and 07AP-361, 2008-Ohio-1107, ¶ 8. " 'A trial court is permitted to rely on its knowledge and experience in determining whether mental distress has been caused.' " *Id.*

{¶ 23} Here, Crawl's social media comments were unquestionably inappropriate. The parties had not seen each other since elementary school and never had any relationship. In that context, calling A.P. by the name of "baby girl," professing love, and expressing a desire to get together soon were bizarre. Even so, if Crawl's actions had been confined to these few strange comments on social media, a reasonable person probably would not have suffered emotional distress as defined by the statute.

{¶ 24} However, Crawl ignores his subsequent actions after making these comments, i.e., when he showed up uninvited and attempted to enter A.P.'s home. This was sufficient to cause mental distress, and, in fact, did cause distress, as A.P. testified. *Compare State v. Neeley*, 2d Dist. Montgomery No. 25229, 2013-Ohio-303, ¶ 19 (finding sufficient evidence of mental distress where victim testified that she was afraid of defendant following his actions and had installed a security system in her home).

{¶ 25} Crawl's next point is that the State failed to establish that he acted knowingly, because he was unaware that his remarks on A.P.'s social media account would cause her mental distress. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶ 26} Again, had Crawl's actions simply been confined to the social media responses, his argument might have merit. More occurred here, however. What was most disturbing was that Crawl attempted to enter A.P.'s home. A reasonable person would be aware that entering or attempting to enter someone's home under these circumstances would cause mental distress.

{¶ 27} In this context, Crawl argues that, absent any prior relationship, he would not have been aware that his actions were unwanted. Ironically, the lack of a prior relationship here indicated the opposite. In essence, Crawl occupied the same position as a stranger; having someone in that position try to break into one's home could certainly cause mental distress.

{¶ 28} Crawl's final argument is that his actions in responding to social media posts and showing up at A.P.'s home did not demonstrate the needed "pattern" of activity to support a stalking conviction. Again, Crawl focuses on the parties' lack of a prior relationship as well as the fact that A.P. did not fear for her safety based on his social media comments.

{¶ 29} A "pattern of conduct" is defined as "two or more actions or incidents closely

related in time, whether or not there has been a prior conviction based on any of those actions or incidents * * *." R.C. 2903.211(D)(1). "In determining what constitutes a pattern of conduct, courts must take every action of the respondent into consideration, even if some of the actions in isolation do not seem particularly threatening." *Cable v. McHenry*, 2d Dist. Montgomery No. 28398, 2019-Ohio-4293, ¶ 12, citing *Middletown v. Jones*, 167 Ohio App.3d 679, 2006-Ohio-3465, 856 N.E.2d 1003, ¶ 10 (12th Dist.). "Explicit threats are not necessary; therefore, nonverbal acts directed at the victim may be enough to cause the victim reasonably to believe that physical harm will ensue." *Id.*, citing *State v. Smith*, 126 Ohio App.3d 193, 709 N.E.2d 1245 (7th Dist.1998).

{¶ 30} For the reasons previously discussed, there was a pattern of conduct. The two social media posts were close in time to Crawl's visit to A.P.'s home, and his attempt to enter her home was a nonverbal act directed at A.P.

{¶ 31} Having reviewed the entire record and having accorded substantial deference to the trial court's credibility decisions, we find the conviction was supported by the manifest weight of the evidence. In turn, that disposes of the argument as to sufficiency of the evidence. Accordingly, both assignments of error are overruled.

## III. Conclusion

{¶ 32} Both of Crawl's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

EPLEY, P.J. and HUFFMAN, J., concur.